JACKSONWHITE
ATTORNEYS AT LAW
*A Professional Corporation*

40 North Center Street, Suite 200
Mesa, Arizona  85201
Telephone No.:       (480) 464-1111
Facsimile No.:        (480) 464-5692
Email:       centraldocket@jacksonwhitelaw.com
*Attorneys for Plaintiffs*
By:     Michael R. Pruitt, SBN 011792
          Email:       mpruitt@jacksonwhitelaw.com
          Nathaniel J. Hill, No. 028151
          Email:       nhill@jacksonwhitelaw.com

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Mavis Shure, M.D., Ph.D., as Personal Representative of the Estate of Lanny I. Hecker, M.D., Ph.D. and Mavis Shure, M.D., Ph.D., <br><br>                    Plaintiffs, <br><br> v. <br><br> Arizona Oncology Associates, P.C., an Arizona professional corporation, <br><br>                    Defendant. | Case No.: _____ <br><br> **COMPLAINT** <br><br> (Violation of the Americans With Disabilities Act; Retaliation in Violation of the Americans With Disabilities Act; Age Discrimination) <br><br> (*Jury Trial Requested*) |

Plaintiffs, Mavis Shure, M.D., Ph.D, as Personal Representative of the Estate of Lanny I. Hecker, M.D., Ph.D. and Mavis Shure, M.D., Ph.D., by and through her counsel undersigned, and for her Complaint, alleges as follows:

## I.      NATURE OF CLAIM

1.      This is a proceeding for damages against Defendant to redress the deprivation of rights secured to Dr. Hecker by the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended and modified, 29 U.S.C. § 621, *et seq.*, the Americans With Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12101, *et seq.*, the Americans

With Disabilities Act Amendments Act ("ADAAA"), and retaliation in violation of the ADA.

## II.   JURISDICTION

2.      The events giving rise to these causes of action occurred in Maricopa County, Arizona within the jurisdiction of this Court.

3.      The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1367(a) and pursuant to the ADEA, as amended and modified, 29 U.S.C. §§ 621 *et seq.*, the ADA, as amended, 42 U.S.C. § 12117, and the ADAAA.

## III.   VENUE

4.      Based on 28 U.S.C. § 1391, the ADEA, and the ADA, venue is proper because the acts detailed in this Complaint occurred within the State of Arizona and the jurisdiction of this Court.

## IV.   PROCEDURAL REQUIREMENTS

5.      Pursuant to 29 U.S.C. § 626 and 42 U.S.C. § 12117, on April 13, 2015, Lanny I. Hecker, M.D., Ph.D. filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") alleging age discrimination, retaliation in violation of the ADA, and violation of the ADA.  The charge of discrimination was timely filed.  On August 6, 2018, the EEOC issued Dr. Hecker a right to sue.  Dr. Hecker has therefore filed a timely charge of discrimination, received a right to sue letter, and satisfied all procedural requirements necessary to bring this action.

## V.   PARTIES

6.      Plaintiff Mavis Shure, M.D., Ph.D. was married to Lanny I. Hecker, M.D., Ph.D. from October 1989 until his death on September 3, 2018.

7.      In June 2014, Lanny I. Hecker, M.D., Ph.D. was 67 years old and was employed by Arizona Oncology and HAL as a medical oncologist and hematologist.

8.      Dr. Hecker was a resident of Maricopa County, Arizona.  Dr. Hecker was married to Plaintiff Dr. Mavis Shure, who is, and at all times relevant to this action has been, a resident of Arizona residing in Maricopa County, Arizona.  On September 3, 2018,

Dr. Hecker died.  A probate was filed, in the Superior Court, Maricopa County, In the Matter of the Estate of Lanny I. Hecker, M.D., Ph.D., Case No. PB2018-092212, and on October 17, 2018, Mavis Shure, M.D., Ph.D. was appointed as Personal Representative of the Estate of Lanny I. Hecker, M.D., Ph.D., without restriction.  As Personal Representative, Mavis Shure, M.D., Ph.D. is authorized to prosecute this civil action on behalf of the Estate of Lanny I. Hecker, M.D., Ph.D.

9.     Defendant Arizona Oncology is an Arizona corporation with business operations in and doing business in Maricopa County, Arizona.

10.     Arizona Oncology advertises that it is "one of the largest medical groups in Arizona, has more than 70 physicians devoted exclusively to providing comprehensive, compassionate and high-quality cancer care" and "specializes in Medical Oncology, Gynecologic Oncology and Radiation Oncology, Hematology, Stem Cell Transplant, Research and Clinical Trials, Genetic Risk Assessment and patient ancillary programs." Arizona Oncology physicians treat thousands of patients each year.

11.     HAL is a division of Arizona Oncology which includes Arizona Oncology physicians located geographically in portions of the greater Phoenix Metropolitan area. Dr. Hecker was one of the "HAL physicians" as defined by the Bylaws of Hematology Associates, Ltd., a division of Arizona Oncology Associates, P.C. (the "HAL Bylaws").

12.     At all material times hereto, Dr. Hecker was an employee of Arizona Oncology within the definition of 29 U.S.C. § 630(f), and interpretive cases and authorities, of the Age Discrimination in Employment Act of 1967 ("ADEA"), as amended and modified, 42 U.S.C. § 12111(4) of the Americans With Disabilities Act ("ADA"), as amended, the Americans With Disabilities Act Amendments Act ("ADAAA"), and state law.

13.     At all times relevant to this action, Arizona Oncology was an employer as defined in 29 U.S.C. § 630(b), and interpretive cases and authorities, of the ADEA, as amended and modified, 42 U.S.C. § 12111(5) of the ADA, and state law.

14.     At all material times hereto, Defendant Arizona Oncology was an employer of 20 or more employees and is therefore defined as an "employer" with respect to the ADEA (29 U.S.C. § 621, *et seq*.) (which requires 20 or more employees), the ADA (42 U.S.C. § 12111(5)) (which requires 15 or more employees), the ADAAA, and state law.

15.     Dr. Hecker was an "employee" as defined by 29 U.S.C. § 630(f), 42 U.S.C. § 12111(4), and interpretive cases and authorities, and he was eligible for the protections of 29 U.S.C. § 623 and 42 U.S.C. § 12101, *et seq*.

### VI.     FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

**A.     Dr. Hecker's education and employment background.**

16.     Prior to obtaining his medical degree, Dr. Hecker obtained his undergraduate (BA) degree in Biology from Queens College, City University New York, and a Master's degree in Botany, as well as a Ph.D. in cellular and molecular biology, both of the latter two from the University of Michigan.  After obtaining his doctorate degree, Dr. Hecker began a post-doctoral fellowship at Oak Ridge National Laboratories in Tennessee, where he worked for four years.  After this, Dr. Hecker worked at the Frederick National Cancer Institute, a branch of the National Cancer Institute (NCI), in Frederick, Maryland, where initially, he continued his work on transfer RNAs, and subsequently changed the focus of his research to chemical carcinogenesis, that is, the mechanism(s) of chemicals that cause cancer.  He worked at the Frederick Cancer Research Center for approximately six years performing biochemical work on chemical carcinogenesis.

17.     In 1983, after a number of years performing basic scientific research as outlined above, Dr. Hecker began medical school at the University of Miami.  He graduated and earned his medical degree in June 1985.  In 1988, Dr. Hecker completed his residency in Internal Medicine at Baylor College of Medicine in Houston, Texas.  In 1993, Dr. Hecker completed two fellowships at the New England Medical Center, one in Hematology and the other in Medical Oncology

18.     Dr. Hecker was independently licensed as a medical doctor in 1986, initially in the State of Texas.  Upon Dr. Hecker's relocation to Arizona, in 1994 the Arizona Medical Board ("AMB") granted him a license to practice as a medical doctor.  Dr. Hecker was licensed to practice medicine in Texas, Arizona, and Pennsylvania.  He held these licenses until his death.

19.     Dr. Hecker was board certified in internal medicine, medical oncology, and hematology.  His certification in Internal Medicine was lifelong, but his certifications in the two different subspecialties of both medical oncology, as well as hematology, were both limited to ten-year spans.  At the end of each ten-year span,  Dr. Hecker was required to fulfill various educational  requirements, including taking proctored, closed-book written examinations, in order to renew and continue the respective board certifications.  As such, Dr. Hecker renewed both his board certifications in medical oncology and in hematology more than once, most recently, in 2011.  He completed the requirements, and passed the respective examinations, in all cases, on the first attempts.

20.     In late July 1994, Dr. Hecker moved to Arizona and went to work at HAL as an employee and shareholder physician.  HAL merged with and became part of Arizona Oncology on December 15, 1998.

21.     Since 1994, Dr. Hecker was a shareholder physician with the medical oncology/hematology practice known as HAL.  This practice was the predecessor of the HAL division of Arizona Oncology following the merger of HAL with Arizona Oncology effective December 15, 1998.  Thus, Dr. Hecker was a founding shareholder of the HAL division of Arizona Oncology, which is now part of U.S. Oncology

22.     Dr. Hecker's employment with Arizona Oncology began on December 15, 1998.  His employment relationship with Arizona Oncology was memorialized in a written and signed Physician Employment Agreement with Arizona Oncology of the same date (December 15, 1998).  That agreement has been amended twice since 1998.  The Employment Agreement refers to Dr. Hecker as a "Shareholder Employee."

23.    The HAL division is governed by a Governing Board and President.  The Governing Board of HAL consists of five members.  In June 2014, the Governing Board members included the following individuals:  President Gerald Lucas, M.D., Sharon Ondreyco, M.D., Mike Janicek, M.D., Michael Roberts, M.D., and Mazen Khattab, M.D. Meetings of the Governing Board occur monthly, and a quorum must be present for the Governing Board to function.  A quorum of the Governing Board is at least 75% of its members.  The authority of the Governing Board is more fully described in paragraph 2.10 of the HAL Bylaws.

24.    During Dr. Hecker's tenure with Arizona Oncology and HAL, at least up to the events giving rise to this cause of action, Dr. Hecker served in various leadership positions, including Laboratory Director, member of the Joint Policy Board (JPB) of Arizona Oncology, and President of the JPB of Arizona Oncology, and was a very respected physician with an unblemished record.

**B.    Dr. Hecker's disability.**

25.    On the evening of May 14, 2013, Dr. Hecker, a life-long non-smoker, presented to the emergency room and in the ensuing two days, he was diagnosed with Stage IV metastatic non-small cell adenocarcinoma of the lung.  The primary cancer consisted of a single nodule found in his right lung, along with some associated lymph nodes in the chest.  In addition, there were four brain metastases.

26.    Shortly before his condition was diagnosed, some of Dr. Hecker's symptoms of metastatic non-small cell adenocarcinoma of the lung included a cough, tiredness, difficulty initiating conversational speech, and difficulty with the initiation of written documents, for example, initiating the writing of notes in patients' medical charts. A day or two before his diagnosis, Dr. Hecker appeared possibly to be having mild difficulty using the buttons on a microwave and/or a mobile telephone.  Prior to his diagnosis, Dr. Hecker was not having great difficulty communicating verbally with his patients because he could read what was in the patients' charts and understand it.  He could also give patients simple explanations.

27.     As a result of his condition, Dr. Hecker was significantly limited in performing the major life activity of normal cell growth, which the average person in the general population can perform.  Despite Dr. Hecker's limitations, he was able to perform the essential functions of his job with or without reasonable accommodations.

28.     Prior to Dr. Hecker going to the hospital, two people noticed changes in Dr. Hecker:  his wife, Dr. Shure, and his medical assistant, Veronica Garcia, formerly Brauer.  No members of the HAL Governing Board noticed Dr. Hecker was having any types of symptoms or signs of any types of medical problems prior to his hospitalization in May 2013.

29.     Dr. Hecker began a medical leave on May 15, 2013 to continue diagnostic evaluation and to undergo treatment.

**C.     Dr. Lucas reports Dr. Hecker to the Arizona Medical Board (AMB).**

30.     On or about June 30, 2013, Dr. Hecker received a letter from Kathleen Muller at the AMB, dated June 26, 2013, marked personal and confidential.  The letter stated that the AMB was in receipt of information that Dr. Hecker's ability to practice had changed due to health issues.  It also indicated that Dr. Hecker needed to inform the AMB thirty days in advance of any anticipated return to practice, along with a statement from his treating physician(s) regarding his condition, including diagnosis and prognosis, medications, recommendations for continuing care and treatment, and his ability to safely practice medicine.  This letter from Ms. Muller was Dr. Hecker's first notice that someone had contacted the AMB about him.  The AMB took no action relating to Dr. Hecker's license to practice medicine, and the June 26, 2013 letter from the AMB was not disciplinary nor was it released to the public.

31.     On Sunday, June 30, 2013, and Monday, July 1, 2013, Dr. Hecker made numerous telephonic inquiries to numerous individuals affiliated with and/or associated with Arizona Oncology regarding the letter sent to the AMB.  All individuals with whom Dr. Hecker spoke denied knowledge of any letter being sent by someone from Arizona Oncology to the AMB.  Ultimately, on July 1, 2013, Dr. Hecker was provided a copy of a

letter sent by Dr. Lucas to the AMB.  Dr. Lucas' letter to the AMB, dated June 6, 2013, reported that Dr. Hecker had been recently diagnosed with metastatic lung cancer, that prior to his diagnosis Dr. Hecker had been seeing patients regularly, that his condition was first noticed by his colleagues at Arizona Oncology, who observed "for a very brief time incomplete thoughts or incoherent sentences on his charts".  Dr. Lucas reported to the AMB that shortly thereafter, Dr. Hecker stopped seeing patients and sought medical care of his own volition.  He reported that Dr. Hecker was now on "indefinite" medical leave. He further reported that Arizona Oncology physicians had taken over the care of Dr. Hecker's patients and had undertaken review of Dr. Hecker's charts.  He reported, "[w]e have not located any additional anomalies or items of concern."  Several representations in Dr. Lucas' June 6, 2013 letter were materially false:  (1) None of Dr. Hecker's colleagues had noticed any changes in his condition, either physical or mental, before he was hospitalized.  All expressed surprise upon learning of Dr. Hecker's illness.  Dr. Hecker's wife, Mavis, and his medical assistant of many years, Veronica, were the only ones who had noted any change in his behavior.  (2) Only **after** Dr. Hecker was admitted to the hospital were his patients' chart notes reviewed, and a few of the notes, from the days immediately preceding his diagnosis, were found to be incomplete because he had not yet completed them.

32.    Dr. Lucas sent the letter to the AMB regarding Dr. Hecker's medical condition without having a conversation with Dr. Hecker regarding his intentions, nor did he or anyone else inform Dr. Hecker that Dr. Lucas had sent this letter to the AMB.  After sending the June 6, 2013 letter to the AMB, Dr. Lucas did not have any follow-up conversations with the AMB to find out what the AMB was doing about the letter and/or Dr. Hecker.

33.    Other than Kathleen Muller sending Dr. Hecker the letter dated June 26, 2013, the AMB took no action regarding the June 6, 2013 letter from Dr. Lucas/Arizona Oncology regarding Dr. Hecker's illness.

34.    In 2013, there was no patient harm arising out of Dr. Hecker's illness.

**D.      Events leading up to Dr. Hecker's return to work in August 2013.**

35.      Following his diagnosis, which began starting on or around May 14, 2013, and continued through the ensuing two days, Dr. Hecker's malignancy responded well to the treatments he underwent.  By July 2013, Dr. Hecker was ready to come back to work in his medical practice.  Dr. Hecker communicated his desire to return to work to his colleague and treating medical oncologist, Michael S. Roberts, M.D.  Dr. Roberts, in turn, involved and continued to involve the legal counsel for Arizona Oncology.  Arizona Oncology's legal counsel objected to Dr. Hecker returning to the practice, saying that if there were any alleged adverse outcomes to any of his patients he, and as a corollary the practice, would be (an) easy target(s) for a lawsuit because of his history of brain metastases.  Dr. Hecker was informed, as a condition for returning to the practice, that he had to obtain a neuropsychology test and be evaluated by a cognitive neurologist.  Dr. Hecker did not know exactly what a neuropsychological (neuropsych) exam was.  He had never had one before.  He was a little hesitant to submit to such an examination, but he did it anyway.  Dr. Hecker believed he would not be allowed to return to work unless he underwent the exam, based on his conversations with the attorneys for Arizona Oncology.

36.      Dr. Hecker submitted to the neuropsych exam in July 2013, at the earliest date available to obtain an appointment with the neuropsychologist.  After Dr. Hecker completed the exam, Dr. Prigatano, a Ph.D. neuropsychologist, and at that point a chaired professor in, and Chairman of, the neuropsychology department, told Dr. Hecker that Dr. Hecker was extremely intelligent, that he had a very high IQ, that there were some subtle inefficiencies present, and that maybe if he took the test again in three months, the results would be even better.  Dr. Hecker and Dr. Shure tried to explain to Dr. Prigatano that, at least most of the items referred to by Dr. Prigatano as "subtle inefficiencies", were characteristics that Dr. Hecker had exhibited for at least the preceding 29 years.  Dr. Prigatano stressed to Dr. Hecker that inefficiencies were not impairments.  Dr. Prigatano claimed that his role did not include commenting on whether Dr. Hecker could return to work.

37.     Subsequent to undergoing the neuropsych exam, Dr. Hecker also saw Dr. Shi, a cognitive neurologist.   Dr. Shi determined, based on the results of the neuropsychology exam that Dr. Hecker had undergone, as well as on Dr. Shi's own review of Dr. Hecker's medical records and scans, in addition to Dr. Shi's interview and examination of Dr. Hecker, that Dr. Hecker could return to work.   Dr. Shi suggested a reduced work schedule initially due to the potentially fatiguing side-effects of the therapies with which Dr. Hecker was being treated.

38.     A copy of Dr. Shi's July 29, 2013 report regarding Dr. Hecker was faxed to the offices of the HAL division of Arizona Oncology and Dr. Lucas obtained a copy of the report without the permission or authorization of Dr. Hecker.

39.     Even after he submitted to and passed these tests and evaluations in the Summer of 2013, Dr. Hecker was informed that there was a great deal of resistance to his return expressed by both HAL's Governing Board and the JPB of Arizona Oncology.

40.     On July 30, 2013, Dr. Hecker sent the attorneys for Arizona Oncology an email stating that he had completed the requisite tests and evaluations for returning to work and that he planned to return to work the week starting August 12, 2013.  Dr. Hecker also told Dr. Roberts that he had completed the tests.   Dr. Hecker requested that the attorneys for Arizona Oncology provide assistance, as they had promised Dr. Hecker previously, during the same discussion in which they insisted that Dr. Hecker undergo the neuropsychology exam, in expediting anything required by the AMB to allow Dr. Hecker to return to work.

41.     Dr. Roberts interacted with the attorneys for Arizona Oncology during the process that led to Dr. Hecker returning to work in August 2013.  On August 2, 2013, Dr. Roberts generated a letter "To Whom It May Concern", to be used to fulfill the requirements outlined in the June 26, 2013 AMB letter sent to Dr. Hecker by Ms. Muller of the AMB, in order to secure Dr. Hecker's approval by the AMB to return to work.  The letter stated in part that "[Dr. Hecker] has done remarkably well to date.  He has been cleared to resume driving, and he has been cleared to go back to work based upon several

physicians' input."  Dr. Roberts further noted, "I have observed Dr. Hecker for many hours and he has no problems with speech and no unusual behavior.  At the present time he has been cleared by Neurology, Neurosurgery, Radiation Oncology and Medical Oncology." Dr. Roberts further elaborated:  "He has also excellent results from his MRI of the brain, with and without Gadolinium and from the Neuropsychological testing.  A repeat MRI will be done at the end of October and if indicated, he may repeat neuropsychological testing thereafter."  This letter from Dr. Roberts was given to the attorneys for Arizona Oncology to send to the AMB.  The attorneys for Arizona Oncology emailed this letter, a note from one of Dr. Hecker's other treating physicians, and the report from Dr. Shi to Kathleen Muller at the AMB.  In her email, Christine Cassetta, the attorney for Arizona Oncology stated, in part, "[a]ll agree that Dr. Hecker is doing remarkably well and is fit to return to practice."

42.    On August 5, 2013, Dr. Roberts also emailed a copy of his August 2, 2013 letter to Dr. Buscema (a gynecological oncologist with Arizona Oncology in Tucson, Arizona, and President of Arizona Oncology and the JPB subsequent to Dr. Hecker), Dr. Lucas, Dr. Peter Mathern, Dr. Ondreyco, and Dr. Janicek.  In his email, Dr. Roberts stated, in pertinent part, as follows:

> Dr. Hecker is looking forward to returning to his practice and is doing remarkably well.  To ensure his progress, I have discussed his case with Dr. David G. Brachman his Radiation Oncologist, Dr. Kris Smith his Neurosurgeon and on several occasions with Dr. Russell Walker who is his attending Neurologist and attending physician during his initial hospitalization.  I have received and have reviewed the summaries of his neuropsychological evaluation and the note from his Neurosurgeon.  Dr. Hecker has also been cleared by Neurology, Neurosurgery, Radiation Oncology and Medical Oncology.  He has excellent results from his MRI of the brain and has completed a PET/CT with minimal residual disease (almost complete remission) after just 3 cycles of chemotherapy.
>
> Attached is the letter that was sent to Roger Morris at Quarles and Brady on August 2nd, which gives a detail update on Dr. Hecker's case and states that in all functioning areas that he would do well with minimal areas of problems that were not felt to be a hindrance for him to return to work.  This letter has been submitted to the Arizona Medical Board for their review.

Dr. Hecker would like to return to work on August 14th and looks for your approvals to do so.  *If you would like copies of the medical tests and evaluations, please let me know*.

[Emphasis added.)  Dr. Hecker was allowed by the AMB and Arizona Oncology to return to work in August 2013.

43.   Before August 14, 2013, Dr. Hecker was fully cleared to return to work.  No member of the Governing Board, JPB, any other physician, practice member or practice manager communicated any restrictions on, conditions relating to, or limitations to Dr. Hecker's right to practice medicine upon his return to the practice in August 2013, nor were any such restrictions, conditions or limitations communicated to Dr. Hecker using any means by any member or associate of the Arizona Oncology Corporation, including, but not limited to, physicians, management personnel, HR personnel, or any legal counsel for Arizona Oncology.

44.   Prior to his return to work in August 2013, Dr. Hecker was never personally, either verbally or in writing, told that he would need to continue to update the Governing Board regarding his condition.   Additionally, he was not told by a member of the Governing Board that he was required to have a neuropsych test every three months.  He was never asked to, nor did he ever promise to, undergo a neuropsych test every three months, nor at any other interval.  He had researched the literature, and at that time, could find no evidence for the utility of regularly scheduled neuropsych examinations, in the setting of brain tumors, for the surveillance of disease progression and/or its sequelae. The gold standard for assessing intracranial, CNS (central nervous system) disease, at least at that point in time, was imaging utilizing fine-cut MRI (magnetic resonance imaging) scans of the brain, with and without intravenous contrast material, every three to six months.

**E.   Dr. Hecker's treatment and working conditions after he returned to work.**

45.   Dr. Hecker returned to work at Arizona Oncology on August 14, 2013.

46.     Upon his return to the practice on August 14, 2013, no one from the Governing Board, JPB, Human Resources, or any other physician, practice member or practice manager advised Dr. Hecker of his rights under the Americans with Disabilities Act (ADA), nor was any such advisement provided using any means by any member or associate of the Arizona Oncology Corporation, including, but not limited to, physicians, management personnel, HR personnel, or any legal counsel for Arizona Oncology. Although Dr. Hecker's medical history and records were protected by the Health Insurance Portability and Accountability Act of 1996 (HIPAA) and the ADA, he was never informed how much of his records were revealed to the Governing Board, other Arizona Oncology physicians, or other non-physician individuals, employed by, or associated with, Arizona Oncology.

47.     Before he became sick in May 2013, Dr. Hecker was President of the JPB. He had to resign his appointment as President of the JPB after he became sick.  When he came back to work in August 2013, Dr. Hecker tried to resume his position on the JPB. Following his cancer diagnosis in May 2013, Dr. Hecker had not resigned his position as a member of the JPB, but rather had taken a temporary leave.  As such, he thought he could still go back as a JPB member and not the President.  Dr. Hecker thought because he took a leave, his place would still be there when he came back.  However, Dr. Hecker received an email from Dr. Lucas telling him he had relinquished his position and he was no longer permitted to attend any JPB meetings.  The email stated that because he had been replaced, Dr. Hecker could not attend the McKesson MSA meeting on November 13th as only two JPB members per division would be allowed to attend.  Prior to his cancer diagnosis in May 2013, Dr. Hecker was affiliated with or had been a member of the JPB for many years.

48.     For years before Dr. Hecker's illness in May 2013, he had been responsible for making the schedules for all of the medical oncologists and/or hematologists, including vacation times, weekly call schedules, daily call schedules, and holiday call schedules, with a goal, among others, being (1) ensuring adequate physician coverage at all hospital

and office locations, (2) ensuring that workloads were equitably distributed among physicians, (3) attempting to equitably accommodate the various physicians' requests for personal, vacation, and education time, and 4) attempting to ensure that during times when some doctors were on vacation, the remaining doctors would not be left with an unduly burdensome or untenable workload.  Given the number of doctors, as well as the number of offices and hospitals requiring coverage, the scheduling process was complicated and involved.  Dr. Hecker gladly accepted assistance from Rose Margarella, after she began working as the Physicians' Administrative Assistant, to assist him with preparation of the division's schedules.

49.     After Dr. Hecker returned to work on August 14, 2013, the schedule making duties were not returned to him.  Ms. Margarella was required to check all the schedules with Dr. Roberts, upon information and belief, because 1) Dr. Roberts and/or his spouse, wanted to have all of their many scheduling requests honored, and allegedly, at times, Dr. Cortas did not comply with these requests; 2) allegedly, there were times at which Dr. Cortas produced schedules that did not work; and 3) in addition, during that same time period, as well as during the previous couple of years, Dr. Cortas was not infrequently, equally adamant about having her exact scheduling requests honored.  Despite Dr. Hecker no longer being responsible for making the schedules, sometimes, if a problem arose with the schedule, Ms. Margarella would stop by Dr. Hecker's office and ask if he would help straighten things out.

50.     On Friday just before the Labor Day holiday weekend in 2013, Ms. Margarella learned that Dr. Cortas had made changes to the schedule for her own days off but did not have some hospitals or offices covered.  Ms. Margarella requested Dr. Hecker's input.  Dr. Cortas confronted Dr. Hecker in his office and began loudly complaining in a very agitated manner, and with a raised voice, berated Ms. Margarella for not respecting her (Dr. Cortas).  Out of frustration for not being able to get a word in edgewise, and in an effort to quiet Dr. Cortas, Dr. Hecker briefly raised his voice in response and requested that she sit down.

51.     After Dr. Cortas left his office, Dr. Hecker was able to look over the schedule and revise it to accommodate all of the time off requested by Dr. Cortas and to ensure that no physician had back-to-back on call, and that all offices and hospitals had appropriate physician coverage.   Dr. Hecker showed the changed schedule to Ms. Margarella who incorporated the changes in the template and gave a copy to Dr. Cortas. Despite the schedule still providing all of her requested time off, a few minutes later, Dr. Cortas came into Dr. Hecker's office, threw the revised copy of the schedule at him, and stomped out.

52.     Following Dr. Cortas' outburst, she allegedly complained to Dr. Lucas regarding Dr. Hecker's behavior during the outburst.  That evening, upon arrival at home, Dr. Hecker received a call from Dr. Lucas who shared with Dr. Hecker that Dr. Cortas had complained to him about how Dr. Hecker treated her.  Dr. Lucas told Dr. Hecker that he should apologize to Dr. Cortas.  Dr. Lucas never bothered to ask Dr. Hecker what had happened.  Despite this, Dr. Hecker explained the circumstances including that Dr. Cortas was out of control and was not listening to anything he said.  He reminded Dr. Lucas that 1) he was a senior partner and 2) he was minding his own business, 3) he was just trying to help Ms. Margarella out so that the practice could have calls scheduled for the upcoming weekend and 4) that Dr. Cortas just barged into his office and started yelling.  Dr. Hecker told Dr. Lucas that it was Dr. Cortas who should apologize.

53.     Several times after this incident, Dr. Lucas asked Dr. Hecker if he had apologized to Dr. Cortas.   Upon information and belief, Dr. Lucas disparately never disciplined Dr. Cortas, a much younger, non-disabled doctor, nor was she told to apologize to Dr. Hecker for her behavior.  Dr. Lucas treated Dr. Hecker differently than Dr. Cortas, a younger, non-disabled physician.

54.     Beginning in 2011, in part due to the urging of Dr. Roberts, Dr. Hecker began looking at the work requirements of shareholders who desired to work after age 65. The concept was to formulate a system whereby full shareholders could gradually reduce some of their work requirements but still retain subsets of some of their shares and

distributions.  At that time Dr. Hecker was 64 years old and had no plans to decrease his full time work load, as Dr. Hecker had always maintained that he wanted to continue working until he was at least 75 years old.  Dr. Hecker gave Dr. Lucas a written outline of his proposal, but Dr. Lucas never brought it up at any of the shareholder meetings.

55.     During Dr. Lucas' tenure as HAL President, when younger physicians, whether employees or shareholders, brought complaints including financial concerns to Dr. Lucas, he often brought up their complaints/issues himself, but when Dr. Hecker again mentioned the "over 65" proposal, Dr. Lucas told Dr. Hecker to write it up and present it himself.  When Dr. Hecker did so, Dr. Lucas rejected the idea with no discussion, all within one minute.  Dr. Lucas treated Dr. Hecker differently than younger, and/or non-disabled physicians.

56.     Prior to his return to work in August 2013, no one at Arizona Oncology told Dr. Hecker that his patient files would be reviewed.  At some point during the first few months after Dr. Hecker's return to work, during a HAL Governing Board meeting, Dr. Hecker was told that Arizona Oncology would be reviewing his patients' medical charts. Later, this was confirmed in an October 9, 2013 email to Dr. Hecker from Dr. Lucas stating that all of Dr. Hecker's new patient consults, as well as all follow-up patients that were seen by Dr. Hecker without a mid-level extender, would be reviewed.  Dr. Hecker felt that this was excessive, as no other physician had ever been so subjected.  Prior to October 2013, Arizona Oncology had a practice regarding reviewing charts, but it had never been formalized, nor, in any practical terms, implemented, and it was mainly for newly hired physicians of Arizona Oncology.  The Governing Board allegedly began reviewing all of Dr. Hecker's charts, but did not review any other doctors' charts, including those of any of the new doctors.

57.     Dr. Hecker's patient charts were never reviewed, to his knowledge, prior to his cancer diagnosis.  Dr. Hecker was singled out, due to his age and/or disability, and his charts were scrutinized in a manner that was not applied to other physicians because the

HAL Governing Board was determined to find a basis to take adverse actions against Dr. Hecker.

58.     Ultimately, after Dr. Hecker objected that he was being treated unfairly, the Governing Board adopted a rule to review charts of new physicians, but only five charts every three months.  After Dr. Hecker protested that he was being treated differently, most of the Governing Board did not want to change the practice, but ultimately claimed they would review only ten of Dr. Hecker's new patient charts every three months.  Dr. Hecker was treated differently than younger, and/or non-disabled physicians.

59.     Between October 9, 2013 and June 2014, Dr. Hecker was never presented with any of his patient charts about which there were any concerns.

60.     The Governing Board never provided Dr. Hecker feedback on his charts based on any of its reviews.  However, the practice administrator, Rob Leitz, informed Dr. Hecker, after Dr. Hecker repeatedly questioned him about his chart reviews, that his charts were very good and in fact several physicians stated to him that they frequently learned new information from reading the patient chart notes written by Dr. Hecker.  Rob Leitz also informed Dr. Hecker that no doctor expressed any concern about either Dr. Hecker's patient charts or his patient care.

**F.     Dr. Hecker complains to the Governing Board who took deliberate actions to interfere with Dr. Hecker's medical practice and retaliate against him.**

61.     Before 2013, new physicians were being placed in the Scottsdale office on the same days and at the same times as Dr. Hecker, including Dr. Seetharam, Dr. Bibb, and Dr. Cortas.  As a result, these physicians were then, by and large, also assigned to the Phoenix office on the same days, and during the same times, as Dr. Hecker, thus also reducing the number of new available patients assigned to Dr. Hecker in or from the Phoenix office locale.  These new physicians competed with Dr. Hecker for new patients, leading to Dr. Hecker receiving fewer patient consults.  None of these doctors were assigned to the same shifts as Dr. Roberts, so he avoided the competition from these new

physicians during his shifts.  Both Dr. Seetharam and Dr. Roberts were substantially younger than Dr. Hecker and non-disabled.  Later, additional doctors were placed in the Scottsdale office on the same days and at the same times as Dr. Hecker, further encroaching on the consultations available to Dr. Hecker.  Dr. Hecker raised objections to having the other doctors assigned only during the same days, times, and venues as his shifts, and not during those of Dr. Roberts or other doctors in the practice, but his objections were rejected.  Ultimately, at a HAL practice meeting, Dr. Hecker voiced that he wanted to be compensated for the inequitable encroachment upon his patient referral base.  He did not receive any such compensation.

62.     During 2014, the practice hired two new, younger doctors with the alleged intention of having them work on the west side of the valley, in a planned west valley office.  The practice planned to open an office near the Banner Estrella area.  Arizona Oncology, however, never opened this office.  Instead, Arizona Oncology placed one of the two doctors at the Glendale-Saguaro Cancer Center and the second at the Biltmore office.  These two new, younger doctors needed patients to see.  By removing Dr. Hecker from the practice, hundreds of patients would be made available for redistribution to other practice physicians.

63.     Dr. Hecker also complained that he was only receiving 75% of the shared pool of compensation, but that he was charged for 100% of the shared expenses.  Shareholders at HAL are paid a share from a pooled account known as the "20% pool."  Before Dr. Hecker's medical leave in June 2013, he was paid a full share from the 20% pool.  When Dr. Hecker returned to work on August 14, 2013, because he was working only six sessions (instead of eight sessions), he received only three-fourths of a share of the 20% pool, but he was still required to pay 100% of the shared expenses.  At the same time, Dr. Mathern, a non-disabled physician who was approximately 52 years old, was working 50% in Flagstaff and 50% in Phoenix.  Dr. Mathern only received one-half of the 20% pool, but he was only responsible for 50% of the shared expenses.  By contrast, Arizona Oncology chose to pay Dr. Hecker only 75% of a full share from the 20% pool;

yet, Arizona Oncology did not reduce Dr. Hecker's share of at least some of the shared expenses, requiring him to pay a full 100% of the shared expenses.  Dr. Hecker brought this up with Dr. Lucas in the Fall of 2013 and received no meaningful explanation, except a message that it was Dr. Hecker's responsibility to bring this up at the HAL shareholder meeting.

64.    Dr. Hecker raised other compensation concerns with the Governing Board. For example, he made a proposal for physicians over 65 years old.

65.    Dr. Lucas either ignored, disregarded, or opposed Dr. Hecker's concerns. Other younger, non-disabled physicians were not similarly treated.

**G.    Dr. Hecker was retaliated against and treated disparately/discriminatorily because of his age and disability.**

66.    On February 11, 2014, Dr. Hecker had a routine periodic surveillance MRI scan of the brain performed.  The MRI showed a tiny left temporal tip spot on Dr. Hecker's brain.  Neither the radiation oncologist, nor the neuroradiologists were able to ascertain whether the spot was a blood vessel versus a punctuate malignancy.  Because of the lack of a definitive diagnosis, it was recommended that Dr. Hecker have a repeat MRI scan of the brain in several months in order to reevaluate the spot.  Dr. Hecker had no associated symptoms or signs, either at the time the spot was first detected, nor subsequent to its initial discovery.  On February 11, 2014, when Dr. Hecker and Dr. Shure were first told of this temporal tip spot, Dr. Shure asked Dr. Hecker's radiation oncologist, Dr. David Brachman, what symptoms or signs there might be in the event that the spot was a malignancy.  Dr. Brachman responded, "none."  Dr. Hecker's treating medical oncologist, Dr. Michael Roberts, was aware of this radiographic finding at or around the time of the February 11, 2014 MRI scan.  Sometime in late February or early March 2014, Dr. Roberts told Dr. Hecker and Dr. Shure, as they were talking with Dr. Roberts in Dr. Hecker's office, that he thought the spot was probably only a blood vessel, not a new brain metastasis.

67.     On March 11, 2014, Dr. Lucas sent an email to Christopher T. Dang at Quarles & Brady inquiring if an agreement had ever been formalized in writing with Dr. Hecker following his return to work in August 2013.  The email stated in pertinent part,

> Do you recall or have any documents regarding Dr. Hecker when he returned to work?  I know we placed restrictions on him such as not going to the hospitals, as we could not supervise him there, as well as having a PA in clinic with him.  I don't see that this was ever formalized in a document, and he is now seen [sic] some patients in the hospital, which will need to be addressed.

Mr. Dang responded, "Roger [Morris] discussed Dr. Hecker's return to work considerations with Dr. Roberts.  Roger advises checking with Dr. Roberts to see how this was implemented."

68.     Sometime in April 2014, around the same time Dr. Roberts reported that Dr. Hecker had "no evidence of any deficit[s] at all," Dr. Lucas called Dr. Hecker and asked if it was time to have a repeat neuropsych test.  Dr. Lucas never said he was speaking on behalf of the Governing Board, never explained why he wanted another test, and never provided any explanation or justification for his request.  The evening before, Dr. Hecker had called Dr. Lucas about an "election buddy" vote and left a voice message for Dr. Lucas.  Dr. Hecker's message asked about the nature of the vote and informed Dr. Lucas that none of the physicians, including Dr. Ondreyco, Dr. Roberts, and Dr. Lee had an understanding of the nature of the vote.  When Dr. Lucas telephoned Dr. Hecker that day in April 2014, Dr. Lucas did not give Dr. Hecker any further information concerning the vote.  Rather, he only asked Dr. Hecker about another "neuropsych" test.

69.     In response to Dr. Lucas' question, Dr. Hecker told Dr. Lucas that he was followed by experts in the field, and was adhering to the standard of care for his disease, which at that point in Dr. Hecker's treatment consisted of fine-cut MRI scans of the brain approximately every three months, although some experts used the time interval of between three and six months.  In addition, Dr. Hecker's charts were being reviewed and there had been no patient care issues.  Dr. Hecker told Dr. Lucas that he was doing well physically and mentally, and that he was scrutinized more than any other physician in the

HAL practice, past or current.  Dr. Lucas did not claim there were any problems with Dr. Hecker's charts or complaints from any patients, or any issues involving patient care.  Dr. Lucas did not allege any problems or issues involving Dr. Hecker, including his behavior or his performance.  The conversation with Dr. Lucas became hostile.  Dr. Lucas did not bring up the subject of any type of neurocognitive evaluation again until the letter dated August 12, 2014, signed by both Dr. Lucas and Dr. Buscema, and received by Dr. Hecker via FedEx overnight delivery on August 16, 2014.

70.     On May 20, 2014, Dr. Hecker had another routine periodic surveillance MRI scan of his brain performed.  During his follow-up visit with Dr. Brachman later that same day, Dr. Hecker learned that the spot on his brain appeared to have enlarged slightly, increasing from two to 2.8 millimeters in size, to approximately four millimeters in size.  Dr. Hecker still had no symptoms or signs associated with the slightly enlarged spot.  Dr. Brachman opined that the spot was easily amenable to being prophylactically ablated via outpatient stereotactic radiosurgery, a gamma-knife procedure.   The procedure was scheduled for Friday, May 30, 2014.

71.     After Dr. Hecker's office visit with Dr. Brachman on May 20, 2014, Dr. Brachman wrote a letter to Dr. Roberts with an update on Dr. Hecker's treatment, the status of the brain spot, and the proposed treatment.  Dr. Brachman advised Dr. Roberts that he did not expect Dr. Hecker to have any symptoms.

72.     On Friday, May 30, 2014, Dr. Hecker underwent outpatient stereotactic radiosurgery without incident.

73.     In May 2014, Misti Mobley was a nurse practitioner at Arizona Oncology who worked for both Dr. Hecker and Dr. Roberts.  Not only did Ms. Mobley work with Dr. Hecker, she was also frequently the provider who saw Dr. Hecker for follow-up visits during his chemotherapy treatments, rather than Dr. Roberts, despite Dr. Roberts officially being Dr. Hecker's treating physician (medical oncologist).  Soon after learning the results of the May 20, 2014 MRI scan, and Dr. Brachman's recommendations regarding the isolated spot, Dr. Hecker explained to Ms. Mobley that he would be undergoing a gamma-

knife procedure on Friday, May 30, 2014, and therefore would be absent from work that day, but planned to be back at work in the office the next work day, Monday, June 2, 2014. Ms. Mobley, Dr. Roberts' nurse practitioner, was aware of the gamma-knife procedure.

74.    Between learning of the MRI scan results on May 20, 2014, and undergoing the gamma-knife procedure on May 30, 2014, there would have been, at most, one day on which Dr. Roberts and Dr. Hecker might have been in the same office together:  i.e., Friday, May 23, 2014.

75.    Even when in the same office on the same day, Dr. Hecker and Dr. Roberts' paths did not always cross.

76.    Dr. Hecker and Dr. Roberts were not good friends.  They did not converse socially by telephone, or socialize, or interact outside of the office except in the context of seeing patients in hospitals.  They were colleagues in the same profession and in the same medical practice.  Except in the office, or occasionally if their paths crossed while seeing patients in a given hospital, or in situations regarding the care of patients, they did not communicate frequently.  Therefore, it is likely that between the May 20, 2014 scan and the May 30, 2014 gamma-knife procedure, Dr. Roberts and Dr. Hecker did not cross paths.

77.    Dr. Hecker did not hide or otherwise keep the existence of the single, small spot on his brain, and/or the fact that he underwent the May 30, 2014 gamma-knife procedure, from Dr. Roberts.

78.    On or before Friday, June 13, 2014, without notifying Dr. Hecker either beforehand or afterwards, Dr. Michael Roberts contacted Roger N. Morris, an attorney with the law firm of Quarles & Brady, legal counsel for Arizona Oncology, regarding Dr. Hecker.  In response, Mr. Morris allegedly told Dr. Roberts that he would talk to Christine Cassetta, who had a good relationship with Dr. Hecker and she would connect with Dr. Hecker.  Christine Cassetta was/is another attorney with Quarles & Brady, who had, at the end of July 2013, and the beginning of August 2013, assisted Dr. Hecker, relative to the AMB, with Dr. Hecker's return to work at his medical practice subsequent to his initial

cancer diagnosis.  As a result, it appears that it was felt that she might be perceived as having a good relationship with Dr. Hecker, and, as such, could conceivably reach out to Dr. Hecker without the appearance of threat.

79.  On June 13, 2014, Roger Morris sent Dr. Roberts an email stating, "Christine [Cassetta] has reached out to [Dr. Hecker].  I'll let you know what happens."  Dr. Roberts responded, "Thank you."

80.  On June 13, 2014, Dr. Hecker received an email from Christine Cassetta, an attorney in the same healthcare law practice group at Quarles & Brady as Roger N. Morris, and thus legal counsel for Arizona Oncology.  In relevant part, the email from Ms. Cassetta states:

> We are just checking in to see how things are going.  We anticipate that the board may ask for an update and we want to be prepared.  If anything has changed, it would be better for you with the board if any information comes from you as opposed to from a patient complaint, for example.  Please let [sic] give us an update.

81.  On Sunday, June 15, 2014, at 9:10 p.m., Dr. Hecker responded to Ms. Cassetta, with a copy to Roger Morris, by email as follows:

> Thanks for your note from Friday.  I am doing well.  Previously, I had started writing an update to send to the board, and was intending to contact you once I had the update completed.  I will forward you my finished update later this week.

82.  On Monday, June 16, 2014, at 7:58 a.m., Ms. Cassetta replied, "[t]hat sounds good.  We'll keep an eye out for it."

83.  Prior to June 13, 2014, Dr. Hecker had started a draft of a letter for the AMB.  After receipt of Ms. Cassetta's June 13, 2014 email, Dr. Hecker continued to prepare his letter for the AMB to provide an update regarding his medical condition and status.

84.  Dr. Hecker planned to send his update to the AMB.  However, due to Arizona Oncology's actions on June 17, 2014, the draft update was never finalized, nor was it sent to either the AMB or Ms. Cassetta.

85.    On the evening of June 16, 2014, after Ms. Cassetta responded to Dr. Hecker's reply email, Dr. Michael Roberts spoke to Dr. Sharon Ondreyco allegedly regarding concerns that Dr. Hecker recently had a "recurrence of his cancer."

86.    On the morning of June 17, 2014, less than 48 hours after Dr. Hecker responded to Ms. Cassetta's inquiry and told Ms. Cassetta that he would finish his update for the AMB later in the week and would share a copy with her, Dr. Lucas called an emergency meeting of the Governing Board to take action regarding Dr. Hecker. Dr. Lucas, as President of the HAL Governing Board, sent an email to the other members of the Governing Board, Dr. Roberts, Dr. Janicek, Dr. Ondreyco, and Dr. Khattab, and also copied the email to Brian Schade and Rob Leitz, the latter two individuals being in upper-level managerial and/or administrative positions at Arizona Oncology and/or the HAL division of Arizona Oncology, stating,

> We need to have an ad hoc GB meeting today to discuss Dr. Hecker. I am scheduling this for 6:30pm today at Biltmore. It would be best for us to all be there in person, but call in will be available given the short notice. I am going to ask Roger Morris to be present, as we will need legal advice, **and for him to present his communication on the matter thus far. My opinion at this point is that we will need to suspend Dr. Hecker from his clinical duties until we sort this out.** He had an obligation to notify us of any change in this status. Please let me know if you will be able to attend in person.

[Emphasis added.]

87.    At the June 17, 2014 Governing Board meeting, three members of the Governing Board out of five participated in the relevant part of the meeting including Dr. Lucas, Dr. Ondreyco and Dr. Janicek, who allegedly participated by Skype. Dr. Roberts allegedly attended the initial part of the meeting, but was recused for the remainder of the meeting and after leaving, did not return to the meeting. Dr. Khattab was not present.

88.    A.R.S. § 32-1451(A) states that a doctor of medicine shall report to the AMB "any information that appears to show that a doctor of medicine is or may be medically incompetent, is or may be guilty of unprofessional conduct or is or may be mentally or physically unable safely to engage in any practice of medicine."

89.     On June 17, 2014, the Defendant Arizona Oncology completely lacked any credible information that appeared to show that Dr. Hecker was or may be (1) medically incompetent, (2) guilty of unprofessional conduct, or (3) mentally or physically unable safely to engage in the practice of medicine.

90.     On the evening of June 17, 2014, Dr. Hecker received a telephone call from Dr. Gerald Lucas, who informed Dr. Hecker that the Governing Board had voted to suspend Dr. Hecker from the practice, place him on indefinite medical leave, report him to the AMB, and cancel his patients for the next day.  Dr. Lucas informed Dr. Hecker that Dr. Hecker's patients would be rescheduled and that Dr. Hecker would not be seeing any patients the next day, or days subsequent.  Dr. Hecker was also informed that he could not come into the office, and should he try to do so, he would be bodily removed.  Dr. Hecker was shocked.  He asked about the basis for such actions.  Dr. Hecker was told that the basis for these actions on the parts of Dr. Lucas, the Governing Board, and Arizona Oncology were because allegedly, Dr. Hecker could not remember his cell phone number on an occasion and because he mistook two physicians, both whom he rarely saw.  Dr. Hecker denied the allegations that he was medically incompetent or a danger to his patients, and he repeated what he had told Dr. Lucas two months earlier in the April 2014 telephone call initiated by Dr. Lucas.  He told Dr. Lucas that he was being followed by experts in the field, and that he was being followed by the standard of care, which at that point in Dr. Hecker's treatment included fine-cut MRI scans of the brain approximately every three months.  Dr. Hecker reiterated that in addition his charts were being reviewed regularly, and there had been no problems or any issues involving patient care.  Drs. Lucas, Ondreyco, and Janicek placed Dr. Hecker on involuntary, indefinite medical leave and decided to report him to the AMB **without** (1) making an individualized assessment based on objective information, (2) ever contacting any individuals with whom Dr. Hecker interacted on a regular basis, (3) providing Dr. Hecker any notice or opportunity to show his ability to safely practice medicine, and (4) engaging in any interactive process with Dr. Hecker to determine whether any reasonable accommodations were available.

91.     Drs. Lucas, Ondreyco and Janicek voted to suspend Dr. Hecker from the practice and report him to the AMB.  A quorum, as defined by the HAL Bylaws, was not present when the vote occurred.  Because a quorum was not present, the action taken by the three Governing Board members constituted an unauthorized action.

92.     Following the telephone call from Dr. Lucas, later that evening, Dr. Hecker spoke separately with, among other individuals, both Dr. Ondreyco and with Mr. Roger Morris, legal counsel for Arizona Oncology.  At that point, despite repeated querying by Drs. Hecker and Shure, neither of these individuals could tell Dr. Hecker any reason why Dr. Hecker was being reported to the AMB.  During all of these conversations, Dr. Hecker repeatedly and strenuously contended that he was medically competent and that any suggestions he was not were false and frivolous.  Additionally, during one of the telephone calls that evening, June 17, 2014, with Roger Morris, Dr. Hecker and Dr. Shure repeatedly asked Mr. Morris about the email communications between Christine Cassetta and Dr. Hecker, including regarding the written update that Dr. Hecker was in the midst of preparing to send to the AMB later that week.  Mr. Morris ignored all of these questions, and gave absolutely no response.  Ultimately, during subsequent conversations, the following day, June 18, 2014, between Mr. Morris and Dr. Hecker and Dr. Shure, after asking Mr. Morris numerous times about the email communications between Ms. Cassetta and Dr. Hecker, and Dr. Hecker's written update to the AMB, Mr. Morris told Dr. Hecker and Dr. Shure that the update should not be completed or sent to Ms. Cassetta nor to the AMB.

93.     After the initial part of the meeting, Dr. Roberts, a Governing Board member of HAL, was recused from the emergency meeting.  Following the events that give rise to this Complaint, later that same evening, Dr. Hecker telephoned Dr. Roberts, who said he had been recused after the initial part of the meeting, and claimed to have no idea what had happened afterwards at the meeting.  When Dr. Hecker explained that Dr. Lucas had just told him, among other things, that he (Dr. Hecker) was being reported to the AMB, Dr. Roberts informed Dr. Hecker that he opposed reporting Dr. Hecker to the AMB.  Dr.

Khattab, the fifth member of the Governing Board, was absent from the meeting and did not vote.  Until his deposition on September 15, 2017, Dr. Roberts had always maintained to both Dr. Hecker and to Dr. Shure, that he had "no idea what happened" at the Governing Board meeting on the evening of June 17, 2014, because he had been recused and/or recused himself.  Dr. Roberts always, including up to the time of his deposition, maintained to Plaintiffs that he had "no idea' why the Governing Board took the actions it did, save for one instance, in July of 2014, on which he told Dr. Shure that "Dr. Lucas felt Dr. Hecker had reneged on his promise to undergo a repeat neuropsych examination.", despite the fact that Dr. Hecker had never made such a promise.

94.     Before the vote to suspend Dr. Hecker and report him to the AMB, the members of the Governing Board never reached out to any of Dr. Hecker's other physicians, including his neurosurgeon or his radiation oncologist, regarding Dr. Hecker's condition.  They ostensibly relied on Dr. Roberts.  They did not call Dr. Hecker's wife or his medical assistant, both of whom saw him for extended periods of time on a daily, or almost daily, basis, to see if either of them had observed any changes in his behaviors, or had reason(s) to be concerned about Dr. Hecker.  Similarly, they did not reach out to Ms. Mobley, the nurse practitioner who worked with both Dr. Hecker and Dr. Roberts, and who, not infrequently, saw Dr. Hecker as a patient at his follow-up appointments.

95.     As of the conversation with Dr. Hecker on June 17, 2014, Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek knew or should have known that Dr. Hecker was in fact medically competent.  At a minimum, they actually entertained doubts about their assertion that Dr. Hecker may be medically incompetent.

96.     Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek knew that they lacked the ability to determine the difference between normal behavior patterns and real neurological deficits.

97.     Acting without a quorum, Drs. Ondreyco and Janicek authorized Dr. Lucas to send a letter to the AMB regarding Dr. Hecker.  On June 18, 2014, Dr. Lucas, as

President of Arizona Oncology Phoenix, signed a letter, on Arizona Oncology letterhead to the AMB.

98.     When Dr. Lucas signed and sent the June 18, 2014 letter to the AMB, Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek knew or should have known that there were no medical competency or patient care issues with Dr. Hecker.  They knew from their conversations the previous day with Dr. Hecker that he was doing well.  Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek knew that Dr. Hecker's patient charts were being regularly reviewed and that there had been no sign of medical incompetence. Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek also knew or should have known through Arizona Oncology's counsel that, in his June 15, 2014 email response to attorney Cassetta, Dr. Hecker supplied the information that he was doing well, and that he was writing an update for the AMB, although the AMB had not requested any such update. Dr. Hecker also indicated, in his email, that the update would be completed later that same week, and a copy would be shared with legal counsel for Arizona Oncology.

99.     Drs. Lucas, Ondreyco, Janicek, and Arizona Oncology utilized the report to the AMB not because of any good faith, legitimate or genuine concern for Dr. Hecker's medical competency but rather as a subterfuge to remove him from the practice for discriminatory reasons.

100.     On June 17, 2014, Arizona Oncology, at the direction of Drs. Lucas, Janicek and Ondreyco, cut off all of Dr. Hecker's email access, all of his access to patient records including the electronic health record (EHR) system for the practice, and indicated to him that he could not come into the office, under threat of being bodily removed should he do so.  Among the ramifications of these actions, of paramount impact were the ramifications resulting from the severance of Dr. Hecker's email access, to wit:  (1) on June 18, 2014, he could not timely interact with Arizona Oncology's legal counsel, Mr. Morris, regarding the possible joint letter to be sent to the AMB, and (2) more importantly, in the ensuing weeks, he did not receive any electronic communications regarding this matter from the AMB, and therefore did not receive things in a timely fashion.

101.    On June 24, 2014, Dr. Hecker underwent a neurological exam by Harry S. Tamm, M.D.  Dr. Tamm noted, "[b]ased upon my examination today, I can find nothing which would indicate a significant cognitive deficit, and nothing which would suggest that Dr. Hecker is incapable of functioning well as a physician."  Two days later, on June 26, 2014, Dr. Hecker, as recommended by Dr. Tamm, had testing (neuropsychological/neuropsychometric) performed by George P. Prigatano, Ph.D., the same neuropsychologist who had administered and performed the neuropsychology exam previously to Dr. Hecker in July 2013.  Dr. Prigatano's diagnostic impression of Dr. Hecker was, "[e]ssentially *normal neuropsychological functioning in a gentleman with superior intellectual ability* who … shows subtle cognitive inefficiencies as noted above."  Just as when Dr. Hecker and Dr. Shure had met previously with Dr. Prigatano in the office visit that followed the completion of the neuropsychometric testing performed in late July 2013, again in the office visit with Dr. Prigatano following the neuropsychometric testing completed on June 26, 2014, Dr. Prigatano emphasized to Drs. Hecker and Shure that subtle inefficiencies did not equate to impairments.

102.    Relying on the representations made by Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek to the AMB, representatives of the AMB contacted Dr. Hecker and told him to "voluntarily" agree to enter into an Interim Consent Agreement for Practice Limitations and Assessment pending resolution of an investigation.  A representative of the AMB contacted Dr. Hecker about the Consent Agreement for Practice Limitations and Assessment ("Consent Agreement") without conducting any type of investigation of the representations made by Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek concerning Dr. Hecker.  Dr. Hecker had significant reason to believe that if he did not acquiesce to the AMB's request regarding the Consent Agreement that his medical license would be involuntarily suspended pending investigation.  As a result of the false statements made to the AMB on June 18, 2014 by Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek, Dr. Hecker was compelled, despite its self-serving misnomer as "voluntary", to enter into an Interim Consent

Agreement for Practice Limitation and Assessment, a non-disciplinary action, that the AMB signed on July 14, 2014.  As a result, Dr. Hecker's right to practice medicine was suspended.  At the time Dr. Hecker signed, under duress, the Interim Consent Agreement, nobody from the AMB informed him that it was a public document.

103.    The factual basis for the Consent Agreement was stated as follows:

> On or about June 19, 2014, the Board received a complaint from Respondent's employer that he may have a health condition that limits his ability to safely practice medicine. Specifically, Respondent's employer reports that Respondent may have a health condition that has the potential to place patients and the public at risk.

104.    Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek's false statements of or concerning Dr. Hecker were the sole and exclusive factual basis, in addition to Dr. Lucas' subsequent repeated contacts to the AMB representative requesting that the AMB do something, for the AMB insisting on Dr. Hecker entering into the Consent Agreement.  According to Danielle Steger's (from the AMB) investigation notes, on June 19, 2014, she "spoke to complainant Dr. Lucas; he explained that there are no patient care issues thus far, but they are worried it could escalate.  He reports they have recently found out that Dr. Hecker has had or may have recurrent brain disease and he failed to tell them about it as required by his agreement when he returned to practice after his last serious illness (lung cancer w/ subsequent treatment).  He also has had trouble remembering his colleagues' names and has had some concerning behavior in forgetting which hospitals his colleagues are associated with, etc."  Neither of the two preceding allegations were true.  It was also noted that he "let it slip" to one of the physicians in the group that he has been undergoing additional treatment.  Upon his return to the practice, Dr. Hecker had no such required agreement to "tell them about it" i.e., to tell the Governing Board about anything.  Upon information and belief, Dr. Lucas purposely amplified Dr. Hecker's condition as "brain disease" and his treatment as being ongoing (by utilizing the phrase "undergoing additional treatment"), when the treatment consisted

of one successful event, and omitted the truly relevant information that the recurrence was a tiny asymptomatic spot that was successfully resolved by a single outpatient treatment.

105.   After submitting the June 18, 2014 letter to the AMB, Dr. Lucas repeatedly contacted Elle Steger to ask what action the AMB was taking, when would it be taken, and why they had not yet taken any action.

106.   On June 26, 2014, Ms. Steger noted, "[received] two voicemails from the complainant asking why we haven't taken any action yet."

107.   On July 1, 2014, Ms. Steger noted, "[received] another few voicemails and emails from complainant wondering why the Board has not taken action.  I explained that we have an order in the works, and that if he is concerned about patient care and safety he is under no obligation to allow Dr. Hecker to step foot inside the building.  **They are wanting a Board document as their "insurance" which of course is not part of what our goal is here."**

108.   Dr. Lucas' July 1, 2014 email to Ms. Steger, stated, in pertinent part, "[h]as the board come to a conclusion or action on the matter?  Please keep me advised and updated."  Ms. Steger responded to Dr. Lucas' July 1, 2014 email that same day.  Her response states, in pertinent part, "I have asked our legal counsel to draft a CONFIDENTIAL limitation that will require the physician to undergo an assessment to determine his safety to practice.  At this time we do not have an update as our counsel is absolutely inundated with orders to be drafted."

109.   The Consent Agreement was a public record and published on the AMB website.  It is still there as of this date.  Numerous hospitals, hospital organizations, insurance companies, and members of the public received notice of the Consent Agreement and the prohibition against Dr. Hecker's practicing medicine until it was determined he had the ability to safely and competently practice medicine.

110.   The consequences of the Consent Agreement were swift and devastating. Dr. Hecker was prohibited from seeing any patients.  Dr. Hecker lost the right to practice in several hospitals and was removed by several insurance companies from providing

medical services to insureds.  Dr. Hecker was prohibited by laboratories providing various diagnostic services, from requesting or ordering laboratory or other diagnostic services for patients.  Dr. Hecker became an instantaneous pariah.

111.   Dr. Hecker was treated differently than other younger, non-disabled physicians because Defendant did not routinely report physicians for behavior that it believed to be concerning.  For example, before Defendant reported Dr. Hecker to the AMB on June 18, 2014, there were two previous HAL physicians who had exhibited genuinely aberrant behavior patterns.  Unlike Dr. Hecker, one of these doctors was never reported to the AMB and the second doctor was only reported to the AMB after her employment relationship with Arizona Oncology had ended.  The first of the two doctors was forced to resign, and the second doctor had a complete breakdown before termination of employment and reporting to the AMB.

112.   In addition to the two physicians mentioned above, following Dr. Hecker's initial diagnosis in May 2013 and while he was still on a medical leave in the Summer of 2013, and before he returned to the practice in August 2013, another HAL doctor, Dr. Donna Smith, a Gynecological-Oncologist (at that time, approximately in her early to mid-50's) working with Dr. Janicek, was believed to have been drinking alcohol prior to coming to work, and to have been showing signs of intoxication while at work.  A medical assistant informed Dr. Janicek that she thought she smelled alcohol on Dr. Smith's breath. Another person had reported smelling alcohol on her breath in an elevator.  Dr. Janicek immediately called either Dr. Lucas and/or Brian Schade, who at the time was Arizona Oncology's statewide Executive Director, to report what the medical assistant told him. Within a few days, Dr. Lucas, Dr. Janicek, and Mr. Schade participated in a meeting with Dr. Smith where they confronted Dr. Smith about the medical assistant's and other individual's reports.  Dr. Smith denied the allegation and offered to undergo random alcohol testing.  Unlike the actions taken against Dr. Hecker on June 17, 2014, before meeting with Dr. Smith, Dr. Janicek and Dr. Lucas did not discuss reporting Dr. Smith to

the AMB.  They wanted to discuss the report with Dr. Smith directly first.  Dr. Smith was allowed to go back to work.

113.    Later in 2013, Dr. Smith was on call for the weekend for the Gynecological Oncology group.  On a Saturday, Dr. Janicek received a telephone call from a hospital saying that there was a hospitalized gynecologic oncology patient requiring immediate attention and that the hospital staff could not get a response from Dr. Smith.  Dr. Janicek went to the hospital and took care of the patient.  After taking care of the patient, Dr. Janicek called Dr. Smith's husband and learned that Dr. Smith had been found floating in their backyard pool by her husband.  Mr. Smith was able to pull Dr. Smith out of the pool and resuscitate her.  Dr. Smith was in the hospital, in a coma and on a ventilator (for about two weeks).  There was concern whether this was an accident or possibly alcohol related.

114.    It is a universal policy that doctors are prohibited from having alcoholic beverages on call.  If Dr. Smith had in fact been drinking and then fell in the pool that would be a serious ethical and medical license violation.  Physicians are not allowed to drink while they are on duty.

115.    Dr. Smith did not come back to work after this incident.  Dr. Lucas met with Dr. Smith at some point after she got out of the hospital, along with Dr. Smith's Attorney and the Attorney for Arizona Oncology.  As a result of the meeting, Dr. Smith agreed to surrender her medical license.  It was after this that Arizona Oncology and the Governing Board only then reported Dr. Smith to the AMB on or around October 11, 2013.

116.    After reporting Dr. Smith to the AMB, Dr. Lucas did not write or call the AMB to follow-up on the status of its investigation regarding Dr. Smith.

117.    When Arizona Oncology suspended Dr. Hecker and reported him to the AMB, it did so with no documented medical basis.  It did so without an actual medical examination of Dr. Hecker or a face-to-face evaluation.  It did so knowing Dr. Hecker's performance was unimpaired.  It knew that one of Dr. Hecker's treating physicians and co-member of the Governing Board could not and did not supply any evidence indicating actual impairment or incompetence on Dr. Hecker's part.  Arizona Oncology knew that

Dr. Hecker was following the standard of care; it knew his patient charts were regularly reviewed and revealed no cause for concern about his medical competency.  It knew no patient care complaints or issues existed.  It knew that Dr. Hecker felt he was well and that he strongly disagreed with any assertion that he was medically incompetent.  Instead, Arizona Oncology maliciously and consciously ignored these objective facts and purposely chose the nuclear option of reporting Dr. Hecker to the AMB, distributing his patients among other, younger, non-disabled doctors, and pestering the AMB to enter an order against Dr. Hecker to both provide cover for its actions against Dr. Hecker, as well as to defend a claim against Arizona Oncology for its malicious behaviors.

118.    In June 2014, Arizona Oncology (HAL Division) had an established peer review committee and it could have used its internal peer review committee and medical oncologists to evaluate Dr. Hecker, but elected not to.

**H.    Although Dr. Hecker was fully cleared to resume the practice of medicine by the AMB, Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek continued to retaliate against Dr. Hecker and to treat him disparately/discriminatorily by conspiring to delay or prevent his return to work to further interfere with his practice because of his age and disability.**

119.    Notwithstanding Arizona Oncology, Dr. Lucas, Dr. Ondreyco, and Dr. Janicek's malicious actions, Dr. Hecker promptly and fully cooperated with all requirements of the AMB, including, but not limited to, submitting to an examination and evaluation by AMB-contracted physicians, for which Dr. Hecker had to pay a significant sum.

120.    On July 22, 2014, Elle Steger from the AMB provided Dr. Lucas with an update.  Her email to Dr. Lucas stated, in pertinent part, as follows:

> I wanted to let you know that Dr. Hecker did enter into a Limitation. It turns out that it is not confidential, but rather "non-disciplinary" …. **I wanted to let you know that the health assessment has been completed and it went very well.  There are no concerns relating to Dr. Hecker's health noted thus far, although we are awaiting**

**a final report.** I am in the process of attempting to have the case reviewed by the full board at the August 6, 2014 meeting if possible. You should receive an official notice if the case is scheduled for the meeting. I wanted to keep you in the loop in the meantime.

[Emphasis added.]

121. Dr. Lucas responded to Ms. Steger's July 22, 2014 email on July 27, 2014, stating:

> Thank you for the update. Will a copy of the health assessment be made available to our practice or is that confidential? I would like to know if the assessment was performed by a Neurologist and if there was formal Neuropsychiatric testing.

122. Ms. Steger responded to Dr. Lucas' July 27, 2014 email on July 28, 2014, stating: "[t]he information you've requested is strictly confidential by law."

123. Later, on August 6, 2014, Christine Cassetta, an attorney for Arizona Oncology, on behalf of Arizona Oncology, wrote to Elle Steger at the AMB stating that she was "surprised that it appeared that only Dr. Greenberg evaluated [Dr. Hecker]." Ms. Cassetta further stated that she did not see how Dr. Greenberg, "as an anesthesiologist and addictionologist is qualified to opine on Dr. Hecker's fitness. Normally, the Board would have required at least a neuropsych evaluation." In a response to Ms. Cassetta's email, Ms. Steger wrote:

> … Dr. Greenberg was the main assessor for PHP purposes, but neuropsych evaluation was done by other professionals and those reports were presented to Dr. Greenberg for review. … Certainly Dr. Greenberg alone would not be qualified to say "safe" if he did not have the reports from other medical professionals to consider.

Dr. Lucas and other members of the HAL Governing Board were expressly aware that Dr. Hecker had undergone a neuropsychological examination as part of the AMB's assessment and subsequent decision to terminate the Practice Limitation. Furthermore, if Arizona Oncology did not trust the ability of the AMB to evaluate the ability of a physician to practice fields of medicine safely, there was no point in Arizona Oncology reporting Dr. Hecker to the AMB, other than to interfere with his medical practice. It was duplicitous for Arizona Oncology to claim it needed to, in the matter of Dr. Hecker, rely

on reporting to, and an assessment by, the AMB, and to then profess to not trust the judgment of the AMB.  Furthermore, it turns out, that Dr. Greenberg, in his role as an addictionologist, explained to Plaintiffs that he was very versed in neuropsychological testing.  This is because, as his role as a PHP (Physician Health Program) consultant to the AMB, he frequently deals with and evaluates the results of outside neurocognitive evaluations and testing, because in Dr. Greenberg's dealings with, and assessments of, many physicians impaired by substance abuse, the results of such tests often show various abnormalities.  Dr. Greenberg explained that he was familiar with the implications of the many possible abnormalities observable in the results of neuropsychometric examinations.

124.   On or about August 6, 2014, the AMB voted to vacate the Consent Agreement.  The wheels of the AMB moved slowly, as a result of which the AMB took until August 26, 2014 to finally issue the written order fully clearing Dr. Hecker to practice medicine without restriction.  The AMB Order includes the following statement: "[b]ased on evidence establishing that Respondent is currently able to safely practice medicine, the Board voted to terminate the Practice Limitation."

125.   Reeling from the AMB's decision finding Dr. Hecker competent to safely practice medicine, and now realizing that the long-term order Arizona Oncology sought from the AMB to justify its actions and to provide the "insurance" requested by them had all failed to materialize, Arizona Oncology decided to double down against Dr. Hecker and to move the goal posts.

126.   Instead of promptly welcoming Dr. Hecker back to the practice with open arms, Arizona Oncology instead set up another road block to Dr. Hecker's return.  After, and despite, being informed by the AMB that Dr. Hecker had completed a health assessment that had gone well, and that the AMB had voted, on August 6, 2014, to lift the restrictions imposed upon Dr. Hecker, Dr. Buscema, the JPB President, and Dr. Lucas, the President of HAL, jointly signed a letter, dated August 12, 2014, to Dr. Hecker.  This letter required him to jump over additional hurdles, including requiring him to submit to an IME with a neurologist, before he could return to work.  The letter states in relevant part:

We are aware that the Arizona State Medical Board voted to lift the restrictions of the Interim Consent Agreement to which you were previously subject and cleared you to return to the practice of medicine. At this time, since we believe it is your intent to return to work at AO and assume performing the essential functions of your job, we would like to engage with you in an interactive process whereby we mutually determine the extent of any work restrictions or limitations you may have and discuss how we might reasonably accommodate you in carrying out your duties, without undue risk to AO's patients.

As part of determining any such work restrictions, limitations or risk, and **prior to your returning to seeing patients at AO, we will require that you submit to an independent medical evaluation (I.M.E.) with Dr. Jiong Shi, at AO's expense**. Please confirm your willingness to submit to an I.M.E. with Dr. Shi by contacting Karen McEntire, AO HR Director, at 520-519-7786. She will then work with you and Dr. Shi to arrange for an evaluation date as soon as possible. . . . .

[Emphasis added.] Arizona Oncology never had to actually pay for the IME. Nothing in Dr. Hecker's Employment Agreement, the HAL Bylaws, or any other governing document authorized Arizona Oncology to require Dr. Hecker to submit to another medical and neuropsychological examination, even after being fully cleared by the AMB, before he would be allowed to return to work.

127. The August 12, 2014 letter feigned that it was sent to engage Dr. Hecker in the "interactive process" to determine how Dr. Hecker could be reasonably assisted and accommodated to do his job. This was the first time Arizona Oncology had ever attempted to engage Dr. Hecker in any interactive process. However, its motive was only to <u>delay</u> Dr. Hecker's return to the practice and to position more roadblocks to his return to work. Dr. Hecker did not ask for an accommodation at this time; he only wanted to return to work. Arizona Oncology, however, endeavored to use the interactive process as a sword against Dr. Hecker, even though the AMB had fully cleared him to practice medicine. Dr. Hecker never asked for any type of accommodation from Arizona Oncology. The only times he made any requests regarding any type(s) of accommodation(s) were of 1) his colleague and treating oncologist, and self-proclaimed "friend", Dr. Michael S. Roberts, and of 2) Misti Mobley, N.P., the nurse practitioner who worked alternately during different shifts, with both Dr. Hecker and Dr. Roberts. Regarding number 1): In the

summer of 2013, in addition to utilizing Ms. Mobley during some office sessions, Dr. Roberts utilized another nurse practitioner full-time.  Before returning to work on August 14, 2013, Dr. Hecker inquired of Dr. Roberts if Dr. Roberts would be willing to let Dr. Hecker have Ms. Mobley work with Dr. Hecker one additional office session (a half day) per week, in light of the periodic fatiguing side-effects of the chemotherapy regimen with which Dr. Hecker was being treated.  Dr. Roberts never gave a verbal answer.  That being said, he did not accede to Dr. Hecker's request.  Regarding number 2): Before returning to work on August 14, 2013, Dr. Hecker inquired of Ms. Mobley, a substantial amount of whose salary and benefits he paid, if she would periodically be willing to start her days a half-hour to forty-five minutes earlier in order to assist him.  She replied that she could not possibly do so, as she felt she already worked hard enough.

128.    Three days after the date of the joint letter from Drs. Lucas and Buscema, but on the same day on which such letter was actually sent (via overnight Federal Express) to Dr. Hecker, Dr. Roberts' progress note regarding Dr. Hecker's follow-up office visit of that same day of August 15, 2014, states that Dr. Hecker "is doing quite well at the present time.  …  He has done very well post treatment by Dr. Brachman for his likely asymptomatic solitary intracranial metastatic lesion.  …  Dr. Hecker to the best of my ability seems to be very close, if not the same, as pre-treatment.  He seems cognitively sharp, coherent, and doing well.  He is fairly oriented at the present time."

129.    In Dr. Roberts' progress note for November 21, 2014, Dr. Roberts states that Dr. Hecker "seems to be very close to his baseline status if not exactly at his baseline status."

130.    On August 27, 2014, Dr. Hecker, through his attorney, sent a letter to the attorney for Arizona Oncology questioning the purpose of requiring Dr. Hecker to submit to an additional medical exam.  Dr. Hecker had already been examined by the AMB and fully cleared to practice medicine.  Counsel for Defendant Arizona Oncology responded by letter dated August 28, 2014 that the AMB did not provide Arizona Oncology with any information regarding Dr. Hecker's medical restrictions and/or needed accommodations

to return to work, and the medical exam would provide Arizona Oncology with the information it needed to engage in an interactive process with Dr. Hecker to determine if he could safely practice medicine, with or without a reasonable accommodation.  In reply, Dr. Hecker's legal counsel responded by letter dated September 8, 2014, asserting that Defendant Arizona Oncology's actions amounted to a violation of the ADA.

131.    Despite being fully cleared by the AMB, Dr. Hecker was required by Defendant Arizona Oncology to submit to yet another independent medical examination.

132.    While Dr. Hecker was on a forced leave of absence, younger and non-disabled oncologists/hematologists, including his treating oncologist, at Arizona Oncology divided Dr. Hecker's patients among themselves.  Securing Dr. Hecker's patients provided a means for these physicians to earn more money.  In fact, maneuvering to secure Dr. Hecker's patients lead some of the physicians to contentious and acrimonious behaviors.

133.    On October 22, 2014, under protest, Dr. Hecker submitted to another independent medical examination by Jiong Shi, M.D., the physician selected by Arizona Oncology.  The cause of this was that despite Dr. Hecker having been examined by a physician appointed by the AMB and determined to be physically and mentally capable of safely practicing medicine, Arizona Oncology required Dr. Hecker to undergo another independent medical examination.  This examination was not necessary and did not serve a legitimate purpose.  This examination was not a good faith effort by Arizona Oncology to engage in the interactive process under the ADA

134.    Prior to the examination, once again, Arizona Oncology created obstacles and delays, by perseverating on attempting to create a list of job descriptions/job requirements (none of which are contained in either the HAL Bylaws or the Employment Agreement) to provide Dr. Shi.  In deposition testimony, in September 2017, one of the doctors from Arizona Oncology attempted to allege, and to parse words, that being deemed safe to practice medicine is different than being deemed safe to practice medical oncology and hematology.  All medical specialties have their own respective requisite

area(s) of knowledge and skill sets, and so, when a licensing board deems a physician safe to practice medicine, that determination is made implicitly and explicitly within the context of the physician's respective specialized area of the global practice of medicine. For instance, a physician in the subspecialty of medical oncology would typically, even absent any type(s) of disabilities, never be considered safe to practice surgery, either as a general surgeon or a surgeon in a subspecialty such as orthopedic surgery.  In their evaluation of Dr. Hecker, all consulting and assessing individuals, including the Board members of the AMB, were aware that Dr. Hecker's practice fields included both medical oncology and hematology.  They were aware of Dr. Hecker's practice fields when they each pronounced Dr. Hecker able to safely engage in the practice of medicine.  In his report, Dr. Shi stated, "[Dr. Hecker's] neurological exam is normal.  There is no deficit. From a neurological standpoint, Dr. Hecker is able to perform daily and occupational functions as a doctor.  He may benefit from a less stressful schedule.  Since there is no change in cognitive function over a year on the neuropsychological evaluation, there is no evidence of any underlying neurodegenerative process at this point."

135.    Although Dr. Hecker was cleared by Dr. Shi to return to work, Arizona Oncology sought to obtain other concessions and/or impose other restrictions on Dr. Hecker prior to permitting him to return.  This engendered numerous conversations, both telephonic and written, between Arizona Oncology's counsel, and that of the Plaintiff, resulting in significant delays and added expense.  Ultimately, Arizona Oncology did not permit Dr. Hecker to return to work until December 8, 2014.

136.    As a result of Arizona Oncology's deliberate actions, Dr. Hecker's medical practice was severely and irrevocably damaged.

137.    Historically, in the HAL practice there was an organizational policy concerning transferring patients from one doctor to another within the practice.  When Dr. Hecker first joined the HAL practice in 1994, the patients were not allowed to switch doctors within the practice, until the senior partners in the practice realized that this policy was resulting in losing patients to other practices.  Since then, and for a period of many

years, patients were allowed to switch doctors within the practice if they received permission from both doctors, the one whose practice they were leaving, and the one whose practice they desired to join.

138.   When Dr. Hecker returned to work in December 2014, this long-time protocol was totally ignored.  At first, the Governing Board insisted that his patients "opt-in" to come back to Dr. Hecker.  The Governing Board rejected Dr. Hecker's request to transfer all of his patients back to him automatically.  Through the Defendants' unjustified actions, all of Dr. Hecker's patients were unilaterally removed from him, but Defendant Arizona Oncology refused to automatically return them to Dr. Hecker when he returned to work.  Defendant Arizona Oncology made it more difficult for Dr. Hecker by using stalling tactics and reducing his patient base.

139.   Arizona Oncology failed to renew Dr. Hecker's memberships/privileges in multiple insurance companies and with multiple hospital staffs.  Instead, they allowed, or made attempts to allow, his memberships/privileges to expire.

140.   When patients were notified that Dr. Hecker was no longer a provider for their respective insurance plan, some written notices were given the practice administrator but nothing was done about them.  Dr. Hecker did not find out that he was no longer on both the United Healthcare plans and the Aetna plans until November 26, 2014, the afternoon before Thanksgiving Day.  Upon information and belief, these insurance plans alone accounted for the coverage of approximately one-third of the practice's patients.  As a result, Dr. Hecker lost access to many patients, both existing and future.

141.   Because of Defendant Arizona Oncology's actions, which in turn resulted in the AMB's actions, Dr. Hecker was also suspended from multiple hospital staffs.  Some of the letters Dr. Hecker received from the hospitals were basically accusatory and humiliating.  Upon information and belief, not only did Arizona Oncology not act proactively in helping Dr. Hecker restore his hospital privileges, Arizona Oncology and its agents attempted to maneuver in ways such that suspension would make it more difficult for Dr. Hecker to regain hospital privileges.  Arizona Oncology behaved this way

even in the face of knowing that the AMB had voted to restore Dr. Hecker's medical license.  Dr. Hecker took it upon himself, partly with the assistance of Rose Margarella, the practice's Physician Administrative Assistant, along with her assistant, to attempt to maintain/regain his hospital and/or insurance panel privileges.

142.   Arizona Oncology simply offered no plan or meaningful help concerning these issues.  Arizona Oncology's response to facilitate Dr. Hecker's return to work was sadly lacking and meaningless, at a minimum, and at times, intentionally obstructionist and harmful.

143.   When Dr. Hecker finally returned to work on December 8, 2014, most of the employees were not informed that he had returned.  Patients also had been told various different reasons for his absence.  Arizona Oncology's proposed letter to be sent to Dr. Hecker's patients about his return was not acceptable as it made it more difficult for Dr. Hecker to get his patients back.  Dr. Hecker had to rewrite and negotiate, over a prolonged time period, the content of the letters to be sent to his patients.

144.   Many of Dr. Hecker's Scottsdale patients never received the letters that Arizona Oncology promised it sent.

145.   The billing department in Tucson was never informed Dr. Hecker had returned to work.

146.   The weekend immediately preceding Dr. Hecker's return to work at the Arizona Oncology/HAL Biltmore office, he could not obtain access to the EHR system and he had to spend time calling and tracking down a person to reset his computer access.  Even upon Dr. Hecker's return to practice on December 8, 2014, the EHR dictation service was not informed that Dr. Hecker was back working and it took Dr. Hecker several weeks before he realized that none of his dictations were being transcribed.  This problem was not corrected until 2015.

147.   Arizona Oncology was also supposed to write a letter welcoming Dr. Hecker back into the practice and informing all of the company's referring physicians of this.  Initially, Arizona Oncology balked at informing all of the company's referring physicians,

because they still did not want Dr. Hecker back in the practice.  Dr. Hecker had to initiate the writing of this letter and make sure it contained correct information.  The letter was not sent until April 2015, approximately ten months after he had been suspended from the practice involuntarily.  By this point, physicians, who in the past had referred patients to Dr. Hecker, would have already had to establish an alternative referral pattern.

148.   The state comptroller for Arizona Oncology, Brad Sattler, was never informed that Dr. Hecker was working full time.

149.   Just prior to Dr. Hecker's return to work on December 8, 2014, he learned that Arizona Oncology was assigning his medical assistant of approximately fourteen years, Veronica, to "other duties" and tried to change her phone number and practice location.  Such action would have been another step making it more difficult to resume Dr. Hecker's practice and for his patients to contact him.  Dr. Hecker was fortunately able to prevent this reassignment of his medical assistant, but the event caused a great deal of added effort, anxiety, and stress to an already extremely stressful predicament.

150.   Before Dr. Hecker was involuntarily removed by Defendant Arizona Oncology on June 17, 2014, for many years, he served as the lab director for the practice. In this position, he received a stipend of $25,000 per year.

151.   Prior to his return to work, Dr. Hecker requested that upon his return to work, he be reinstated in the lab director position he held prior to being suspended and reported to the AMB.  Arizona Oncology refused to reinstate the duties, and the attendant monetary stipend, of lab director to Dr. Hecker.  Instead, the position had been given to, and remained with, a much younger and non-disabled physician, and one who did not have a Ph.D. involving the field of biochemistry.

152.   When Dr. Hecker returned to work, he was never given a list of where his patients had been sent and which doctors were seeing them in his absence.  Other than the letter that was sent to some of his patients, which many patients never received, there was no coordinated effort to make sure that Dr. Hecker's former patients were notified that he was back working.

153.   Many Scottsdale patients never received a letter announcing Dr. Hecker's return.  Veronica, Dr. Hecker's medical assistant, tried calling as many patients as she could.  Since his return, however, Dr. Hecker continually found more patients on other physicians' schedules who wanted to return to Dr. Hecker's practice, but were not given the information that he had returned.  Many of the patients were under the impression that Dr. Hecker was no longer in practice or that he had been on an extended leave secondary to medical problems.

154.   Dr. Hecker's former nurse practitioner, who left him in November 2014 to work exclusively with Dr. Roberts, told at least one patient that Dr. Hecker had a terminal cancer and that he had been treating himself.  Apparently she said this for the purpose of having these patients remain with Dr. Roberts and her rather than returning to Dr. Hecker.

155.   Arizona Oncology also wanted Dr. Hecker to agree to voluntary checkups with Dr. Shi every three to six months and that Arizona Oncology be given copies of Dr. Shi's reports for his return to work.

**I.**    **The U.S. Equal Employment Opportunity Commission agreed that Defendant's actions toward Dr. Hecker were illegal.**

156.   On or before April 13, 2015, Dr. Hecker filed a charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"), dated April 9, 2015, alleging discrimination on the basis of age and disability and retaliation on the basis of disability in violation of the Americans with Disabilities Act of 1990, as amended, and the Age Discrimination in Employment Act of 1967, as amended.  A true and correct copy of the charge of discrimination is attached hereto as Exhibit "A."

157.   On or around December 14, 2016, Dr. Hecker received a Determination from the EEOC dated December 12, 2016 finding that there was reasonable cause to believe Arizona Oncology violated the ADA and ADEA when it subjected Dr. Hecker to unlawful discrimination and retaliation and that the unlawful discrimination and retaliation consisted of Arizona Oncology placing Dr. Hecker on involuntary medical leave; requiring Dr. Hecker to submit to an additional medical examination after he had

been cleared by the AMB to practice medicine; and failing to return Dr. Hecker to the same positions he held prior to his involuntary medical leave of absence.

158.    On August 6, 2018, the EEOC mailed Dr. Hecker a right to sue.

159.    Plaintiffs timely filed this lawsuit.

## COUNT I

### (Violation of the ADA and ADAAA)

160.    All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

161.    Arizona Oncology violated the ADA, as amended, by discriminating against Dr. Hecker with respect to the terms, conditions, or privileges of employment because of Dr. Hecker's cancer diagnosis, and physical impairments, or perceived impairments, that substantially limited one or more major life activities, because of a record of such impairments, or because Dr. Hecker was regarded as having such impairments.

162.    Dr. Hecker had a disability or handicap, or was regarded as having a disability or handicap, or having a record of such impairment within the meaning of the ADA, 42 U.S.C § 12102(1).

163.    Dr. Hecker had metastatic non-small cell adenocarcinoma of the lung.  He was diagnosed with non-small cell adenocarcinoma of the lung on or around May 14, 2013 and the ensuing two days.  Arizona Oncology was aware of Dr. Hecker's medical condition.  Dr. Hecker's medical condition is an impairment which substantially limits him, or Dr. Hecker is perceived as having an impairment that substantially limits him, in one or more major life activities.

164.    Dr. Hecker was qualified for the position he held at Arizona Oncology and he met the minimum qualifications of the position with or without a reasonable accommodation.

165.    Arizona Oncology limited, segregated, or classified Dr. Hecker in a way that deprived or tended to deprive him of employment opportunities or otherwise affected his status as an employee, in violation of the ADA.

166.    Arizona Oncology was aware of the existence of Dr. Hecker's disabilities.

167.    Arizona Oncology had a duty to interact with Dr. Hecker to try to arrive at a reasonable accommodation pursuant to the ADA; however, Arizona Oncology failed to engage in the mandatory interactive process with Dr. Hecker to attempt in good faith to identify and implement a reasonable accommodation in violation of the ADA.

168.    Arizona Oncology treated Dr. Hecker disparately/discriminatorily because of his disability in violation of the ADA, as amended.

169.    Arizona Oncology unilaterally removed Dr. Hecker from his medical practice without warning and maliciously and falsely reported to the AMB that Dr. Hecker may not be physically or mentally capable of practicing medicine, resulting in the temporary suspension of his medical license.  Arizona Oncology utterly failed to engage Dr. Hecker in any meaningful interactive process before doing so.

170.    After Dr. Hecker was cleared by the AMB on August 6, 2014 to resume practicing medicine, Arizona Oncology feigned reliance on the ADA's independent medical examination provisions to keep Dr. Hecker away from work until December 8, 2014.  Arizona Oncology used the ADA as a roadblock to keep Dr. Hecker from returning to work after Dr. Hecker had been cleared to practice medicine without qualification or limitation by the AMB.

171.    Arizona Oncology also 1) refused to transfer all of Dr. Hecker's patients back to him automatically; 2) failed to keep current Dr. Hecker's hospital privileges and status as a covered insurance provider; 3) failed to proactively help Dr. Hecker to regain his hospital privileges and insurance panel privileges; 4) insisted that Dr. Hecker's patients receive a letter that it approved prior to Dr. Hecker's return; 5) stonewalled during the creation of said letter; 6) failed to send the patient letter to Dr. Hecker's Scottsdale patients; 7) repeatedly refused to open Dr. Hecker's electronic health record scheduling templates timely, waiting until almost the last minute so that upon Dr. Hecker's return to work in December 2014 there was a dearth of patients for him to see; 8) failed to inform the billing department in Tucson of Dr. Hecker's return to work; 9) failed to timely

reinstate Dr. Hecker's access to the EHR system; 10) failed to notify the EHR dictation service of Dr. Hecker's return to work; 11) failed to initiate a letter it had agreed to send welcoming Dr. Hecker back to the practice and informing all of the company's referring physicians of Dr. Hecker's return and did not send the letter until April 2015; 12) failed to inform the state comptroller for Arizona Oncology, Brad Sattler, that Dr. Hecker was working full-time; 13) attempted to assign Dr. Hecker's medical assistant of approximately fourteen years to "other duties", and tried to change her phone number and practice location which would have made it more difficult for Dr. Hecker to resume his practice and for his patients to contact him; 14) refused to reinstate Dr. Hecker to his position as Lab Director, in turn depriving him of the $25,000.00 per year stipend; and 15) refused to provide Dr. Hecker a list of where his patients had been sent and which doctors were seeing them in his absence.

172.    The effect of these unlawful employment practices was to classify, limit, and discriminate against Dr. Hecker in ways that jeopardized and tended to deprive him of his employment opportunities and otherwise adversely affect his status as an employee because of his disability in violation of the ADA.

173.    Dr. Hecker, a victim of Arizona Oncology's unlawful employment practices, suffered economic damages in an amount to be determined at trial.

174.    Furthermore, Arizona Oncology and/or its agents committed the acts or omissions complained of herein intentionally, willfully, maliciously, wantonly, or with reckless indifference to Dr. Hecker's legal rights and sensibilities.  In treating Dr. Hecker as alleged, Arizona Oncology acted solely to serve its own interests and consciously or callously disregarded the substantial risk of significant harm its acts or omissions would cause Dr. Hecker.  Consequently, Dr. Hecker is entitled to recovery for his pain and suffering, punitive damages, and all other damages permitted under law in an amount to be proved at trial.

**COUNT II**

**(Retaliation in Violation of the ADA)**

175.   All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

176.   Dr. Hecker engaged in protected activities exercising his rights under the ADA while employed by Arizona Oncology.  Beginning in August 2014, Dr. Hecker attempted to return to work following the AMB's full restoration of his medical license.  However, Arizona Oncology conditioned Dr. Hecker's return to work on Dr. Hecker undergoing an IME by Dr. Jiong Shi.  On August 27, 2014, Dr. Hecker responded to Arizona Oncology's request through his attorney, and questioned the need for an additional IME.  On September 8, 2014, counsel for Dr. Hecker sent another letter to counsel for Arizona Oncology opposing the IME and expressly invoking the protections of the ADA.

177.   Dr. Hecker suffered retaliation on the part of Defendant Arizona Oncology for exercising his rights under the ADA when Defendant Arizona Oncology took the adverse employment actions described herein against Dr. Hecker affecting the terms, conditions, and privileges of his employment.  This retaliation took the form of further adverse employment actions including, but not limited to, Arizona Oncology 1) refused to transfer all of Dr. Hecker's patients back to him automatically; 2) failed to keep current Dr. Hecker's hospital privileges and status as a covered insurance provider; 3) failed to proactively help Dr. Hecker to regain his hospital privileges and insurance panel privileges; 4) insisted that Dr. Hecker's patients receive a letter that it approved prior to Dr. Hecker's return; 5) stonewalled during the creation of said letter; 6) failed to send the patient letter to Dr. Hecker's Scottsdale patients; 7) failed to inform the billing department in Tucson of Dr. Hecker's return to work; 8) failed to timely reinstate Dr. Hecker's access to the EHR system; 9) failed to notify the EHR dictation service of Dr. Hecker's return to work; 10) failed to initiate a letter it had agreed to send welcoming Dr. Hecker back to the practice and informing all of the company's referring physicians of Dr. Hecker's return

and did not send the letter until April 2015; 11) failed to inform the state comptroller for Arizona Oncology, Brad Sattler, that Dr. Hecker was working full-time; 12) attempted to assign Dr. Hecker's medical assistant of approximately fourteen years to "other duties", and tried to change her phone number and practice location which would have made it more difficult for Dr. Hecker to resume his practice and for his patients to contact him; 13) refused to open Dr. Hecker's electronic medical record scheduling templates, thus delaying/preventing the scheduling of patients to see Dr. Hecker; 14) refused to reinstate Dr. Hecker to his position as Lab Director and the $25,000.00 per year stipend; and 15) refused to provide Dr. Hecker a list of where his patients had been sent and which doctors were seeing them in his absence.

178.    Arizona Oncology's actions were in violation of the ADA and were not justified by any legitimate, nondiscriminatory business reason.

179.    Arizona Oncology violated the ADA by retaliating against Dr. Hecker with respect to the terms, conditions, or privileges of his employment because of protected activities.

180.    Dr. Hecker has suffered retaliation in violation of the ADA and is therefore entitled to recover all remedies available to him under the ADA.

181.    As a result of the actions of Arizona Oncology, Dr. Hecker suffered economic damages in an amount to be proved at trial.

182.    Arizona Oncology committed the acts or omissions complained of herein intentionally, willfully, maliciously, wantonly, or with reckless indifference to Dr. Hecker's legal rights and sensibilities.  Arizona Oncology acted solely to serve its own interests and consciously or callously disregarded the substantial risk of significant harm its acts or omissions would cause Dr. Hecker.  Consequently, Dr. Hecker is entitled to recovery for his pain and suffering, for punitive damages, and for all other damages permitted under law in an amount to be proved at trial.

**COUNT III**

**(Age Discrimination in Violation of the ADEA)**

183.    All previous paragraphs of this Complaint are realleged as if set forth more fully herein.

184.    The acts, policies, and practices of Arizona Oncology as alleged herein above, violate the ADEA's age discrimination provisions.

185.    Arizona Oncology treated Dr. Hecker differently than other physicians or persons who were younger than Dr. Hecker.  This disparate treatment included, but was not limited to, 1) Dr. Hecker was reported to the AMB while younger physicians were not similarly reported; 2) Dr. Hecker had his patients transferred to younger physicians; 3) beginning in 2011, Dr. Hecker repeatedly raised concerns about a compensation plan for physicians age 65 and older.  Dr. Hecker proposed that the group formulate a system for shareholder physicians to gradually reduce their work requirements and retain portions of their shares and distributions.  Dr. Hecker did not have any plans to retire when he presented this concept.  Although Dr. Hecker provided Dr. Lucas an outline of this proposal, the issue was never meaningfully supported by Dr. Lucas at any shareholder meetings.  However, when younger physicians or employees presented complaints or concerns, the issues were meaningfully discussed and addressed.  When Dr. Hecker raised the "over 65" proposal, Dr. Lucas told Dr. Hecker to write up a proposal and present it to the group.  However, when Dr. Hecker did so, Dr. Lucas immediately rejected the proposal with no meaningful discussion; 4) when one of the younger, newly hired physicians joined the practice, this new physician was assigned to the same office locations on the same days that Dr. Hecker worked at those locations.  This same behavior occurred sequentially with at least three younger physicians in a row.  This resulted in fewer incoming patients being assigned to Dr. Hecker and reduced his overall earning capabilities.  Other younger shareholder physicians were not subjected to the same or similar level of forced competition for new patients; 5) in 2014, two new physicians were hired with the intention of having them work on the west side of the valley.  However, the new west valley office

was never built and at least one of these physicians was again assigned to the same office location as Dr. Hecker on the same days as Dr. Hecker.  By removing Dr. Hecker from the practice, hundreds of patients would be available for redistribution to other, younger physicians; 6) when Dr. Hecker was put on medical leave by Defendants, his patients were not automatically returned to him, whereas when younger physicians took medical leaves, their patients were freely returned to them when these physicians returned to their respective practices; 7) Defendants unilaterally decided to force Dr. Hecker to take a leave of absence when he allegedly was facing an illness that could impact his physical or mental health, whereas Defendants did not treat younger doctors who objectively suffered from debilitating mental health conditions in a similar manner; and 8) when Dr. Hecker returned to work in December 2014, Defendants refused to reinstate Dr. Hecker to the Lab Director position and permitted a younger physician to retain the position.

186.   In subjecting Dr. Hecker to different and discriminatory treatment in the terms and conditions of his employment different from that of younger employees, Defendant Arizona Oncology willfully and intentionally discriminated against Dr. Hecker on the basis of age.

187.   Dr. Hecker has been damaged by Defendant Arizona Oncology's violation of the ADEA as herein above alleged or as proven at trial.

WHEREFORE, Plaintiff requests that this court enter judgment in her favor and against Defendant Arizona Oncology as follows:

A.   Declare that the employment practices complained of in this Complaint are unlawful and that they violate 42 U.S.C. § 12101, *et seq.* (the ADA and ADAAA) and 29 U.S.C. § 621, *et seq.* (the Age Discrimination in Employment Act);

B.   Order Defendant to make Dr. Hecker's estate whole, pursuant to 42 U.S.C. 12101, *et seq.* (the ADA and ADAAA) and 29 U.S.C. § 621, *et seq.* (the Age Discrimination in Employment Act);

C.     Order Defendant to pay Dr. Hecker's estate actual damages in an amount to be proven at trial for all of their claims;

D.     Order Defendant to make Dr. Hecker's estate whole with full back pay, front pay, and reimbursement for all loss of pension, retirement, insurance, Social Security, and other monetary and non-monetary benefits, all amounts to be proven at trial;

E.     Order Defendant to pay Dr. Hecker's estate general and compensatory damages for its economic losses, pain and suffering, emotional distress, harm to reputation and loss of earning capacity, and all special damages or financial losses that Dr. Hecker's estate has suffered in an amount to be proven at trial;

F.     Order Defendant to pay Dr. Hecker's estate for loss of fringe benefits in an amount that will be proven at trial;

G.     For additional damages to compensate for the taxation of Dr. Hecker's estate's economic damages;

H.     For all relief available under Dr. Hecker's claims for age discrimination, including liquidated damages;

I.     Award Dr. Hecker's estate prejudgment interest from the date each claim for damages was liquidated;

J.     Award Dr. Hecker's estate prejudgment interest on all liquidated sums and interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

K.     Award Dr. Hecker's estate interest on all sums awarded in judgment at the highest legal rate allowable from the date of judgment until paid;

L.     Order Defendant to pay Dr. Hecker's court costs, expenses, and reasonable attorneys' fees in connection with this action, as provided in A.R.S. §§ 12-341 and 341.01 and any other applicable statutes;

M.   Order Defendant to pay Dr. Hecker's punitive damages sufficient to punish Defendant for its malicious actions and to deter such conduct in the future;

N.   For Plaintiff's continuing costs in this matter; and

O.   For such other and further relief as this court deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a jury trial.

**DATED** this 5th day of November, 2018.

### JACKSON WHITE

_s/ Michael R. Pruitt_
By:   Michael R. Pruitt, SBN 011792
        Nathaniel J. Hill, SBN 028151
40 North Center Street, Suite 200
Mesa, Arizona   85201
*Attorneys for Plaintiff*

F:\GHI\Hecker, Lanny\Federal Court\Pleadings\Complaint.docx